ARKANSAS DEPARTMENT OF ENVIRONMENTAL QUALITY
*v.* BRIGHTON CORPORATION; Coltec Industries, Inc.;
Entergy Arkansas, Inc.; First Electric Cooperative Corporation;
Kamo Electric Cooperative, Inc.; Kuhlmen Corporation, On Behalf of
Kulhman Electric Corporation; Magnetic Electric Company; Missouri
Public Service; Pirelli Cable Corporation; Reed & McClain Electrical
Works, Inc.; Reynolds Metals Company; San Angelo Electric Service
Company; Southern Cotton Oil Co.; T&N Electric Company, Inc.;
Texas Eastern Transmission Corporation

02-321 102 S.W.3d 458

Supreme Court of Arkansas
Opinion delivered April 3, 2003

[Petition for rehearing denied May 8, 2003.*]

---

\* BROWN, IMBER, and HANNAH, JJ., would grant.

*Hill, Gilstrap, Perkins & Trotter, PC,* by: *G. Alan Perkins* and *Julie D. Greathouse,* for appellant.

*Mark Pryor*, Att'y Gen., by: *Eric B. Estes* and *Charles L. Moulton*, Ass't Att'ys Gen., for appellee.

TOM GLAZE, Justice. The Arkansas Department of Environmental Quality ("DEQ") appeals from an order of the Jefferson County Circuit Court dismissing its complaint with prejudice. This appeal requires us to construe Ark. Code Ann. § 8-7-501 *et seq.* (Repl. 2000), the Remedial Action Trust Fund Act ("RATFA"), and jurisdiction is therefore proper in this court under Ark. Sup. Ct. R. 1-2(b)(6).

On March 15, 2001, DEQ filed a lawsuit against fifteen separate defendants,[1] seeking a declaratory judgment. The fifteen defendants were alleged to be customers of a defunct corporation called Utility Services, Inc. ("USI"), a company that, from 1975 until 1984 or 1985, had operated on a thirty-acre site in Jefferson County. According to DEQ's complaint, USI engaged in the repair and maintenance of various electrical equipment and components. One of the activities conducted by USI was the treating and filtering of spent oil containing polychlorinated biphenyls, or PCBs, from electrical transformers and other electrical equipment at the site for the purpose of reclaiming the oil or restoring it to or near its original properties. USI also bought or otherwise acquired used PCB-containing oil from other facilities that wished to dispose of the oil and treated or filtered it, as described above, to use in its operations or to sell to other facilities. The treating, filtering, and reclaiming process removed hazardous substances and hazardous wastes from the oil, which was then disposed of at the site. USI additionally operated a wood-treating operation at the site; in that process, the PCB-containing oil was used to preserve wood products.

The complaint further alleged that the defendants, who were individual USI customers, generated and/or transported hazardous substances and hazardous wastes, including PCB-containing oil, to

---

[1] The defendants named in the original complaint were Brighton Corporation; Coltec Industries, Inc.; Entergy Arkansas, Inc.; First Electric Cooperative Corp.: Kamo Electric Cooperative, Inc.; Kuhlmen Corporation on behalf of Kuhlmen Electric Corporation; Magnetic Electric Company; Missouri Public Service; Pirelli Cable Corporation; Reed & McClain Electrical Works, Inc.; Reynolds Metals Company; San Angelo Electric Service Company; Southern Cotton Oil Co.; T&N Electric Company, Inc.; and Texas Eastern Transmission Corporation. They are referred to collectively herein as "the defendants."

the site for disposal. DEQ alleged that the disposal of the hazardous substances and hazardous wastes was conducted in such a manner as to constitute unsound disposal and management practices. DEQ claimed that USI used oil disposed of by the defendants at the site to conduct its wood-treating operations, and as a result of these processes, hazardous substances and hazardous wastes were spilled on the ground, thereby contaminating surface and subsurface waters around the site.

In November of 1990, according to the complaint, DEQ personnel conducted an investigation on the USI property. The investigation revealed a number of drums and tanks, some of which were deteriorating, and which contained high levels of PCB-containing oils, trichloroethene, and tetrachloroethene. In addition, the investigation revealed that the soil in and around the site was contaminated with oil, PCBs, and pentachlorophenol. DEQ asserted that its investigation was limited, but other hazardous wastes were also likely to be present at the site.

On February 21, 1991, DEQ entered into a Consent Administrative Order with Entergy Arkansas, Inc., one of the named defendants, to perform certain preliminary actions to stabilize and secure the site and to reduce the potential for further release of hazardous substances and hazardous wastes. The Consent Administrative Order further provided that the stabilization actions undertaken by Entergy would not constitute final action at the site and that a final remedial action would be negotiated.

On May 12, 1993, DEQ entered into a second Consent Administrative Order with the "Utility Services PRP Committee," primarily for the purpose of removing drums of hazardous substances from the site. On that same day, pursuant to Ark. Code Ann. § 8-7-508(a)(1) and § 8-7-511, DEQ issued an "Administrative Notice of Liability and Request for Information" to a number of entities, including the defendants; however, none of the parties notified of responsibility accepted responsibility for final remediation of the site.

DEQ took no further action regarding this site until it filed suit in March of 2001, seeking a declaratory judgment that the defendants were liable parties under RATFA as either generators or transporters of hazardous substances. The complaint also sought a declaratory judgment that the defendants committed an

unlawful act under Ark. Code Ann. § 8-7-201 *et seq.* (Repl. 2000), the Arkansas Hazardous Waste Management Act ("AHWMA"), by storing, collecting, transporting, treating, or disposing of hazardous waste in such a manner or place as to create, or which was likely to create, a public health hazard.

In response, twelve of the defendants filed motions to dismiss under Ark. R. Civ. P. 12(b)(6), raising four primary issues: 1) DEQ's complaint failed to allege specific facts upon which relief could be granted; 2) the conduct complained of in DEQ's complaint arose before the passage of RATFA, and RATFA's provisions could not be applied retroactively; 3) the "recycling presumption" for used oil contained in DEQ Regulation 23 applied to the defendants; and 4) DEQ was precluded from initiating its action due to the three-year statute of limitations. On September 18, 2001, the trial court conducted a hearing on the defendants' motion to dismiss.

Subsequently, on November 21, 2001, the trial court issued a letter order in which it agreed with the defendants that DEQ failed to state sufficient facts in its complaint on which relief could be granted, that RATFA could not be applied retroactively to conduct that occurred before its passage, and that the recycling provision of Regulation 23 exempted the defendants' conduct at the USI hazardous-substance site. However, the trial court agreed with DEQ that the case was not barred by the three-year statute of limitations. The letter order was reduced to an Order of Dismissal, filed on December 12, 2001, which dismissed DEQ's complaint without prejudice. DEQ then elected to appeal from that order.

On appeal, DEQ first contends that the trial court erred in granting the defendants' motion to dismiss, asserting that it stated sufficient facts in its complaint to make the complaint legally sufficient. In a related issue, DEQ urges that RATFA extends liability to "generators" and "transporters" who cause the disposal of hazardous substances; on this point, DEQ takes issue with the trial court's conclusion that its complaint did not sufficiently allege that any of the defendants actively "disposed" of any hazardous substances at the USI site. Because these two points are so closely linked, we treat them together.

As an initial matter, although DEQ suggests that this court should apply a *de novo* standard of review to its determina-

tion of the propriety of the trial court's granting the defendants' motion to dismiss, our standard of review in such appeals is well-settled. In reviewing the trial court's decision on a motion to dismiss under Ark. R. Civ. P. 12(b)(6), we treat the facts alleged in the complaint as true and view them in the light most favorable to the party who filed the complaint. *Clayborn v. Bankers Standard Ins. Co.*, 348 Ark. 557, 75 S.W.3d 174 (2002); *Martin v. Equitable Life Assurance Soc'y*, 344 Ark. 177, 40 S.W.3d 733 (2001). In test-ing the sufficiency of the complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Clayborn, supra.* Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. *Id.*; Ark. R. Civ. P. 8(a). We look to the underlying facts supporting an alleged cause of action to determine whether the matter has been sufficiently pled. *Country Corner Food & Drug, Inc. v. First State Bank & Trust Co.*, 332 Ark. 645, 966 S.W.2d 894 (1998).

■ Arkansas's rules of civil procedure make it clear that a pleading which sets forth a claim for relief "shall contain . . . a statement in ordinary and concise language of *facts showing that the . . . pleader is entitled to relief*[.]" Ark. R. Civ. P. 8(a) (emphasis added). Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state facts upon which relief can be granted." This court has stated many times that these two rules must be read together in testing the sufficiency of the complaint; we have stated with equal frequency that facts, not mere conclusions, must be alleged. *Brown v. Arkansas Dep't of Correction*, 339 Ark. 458, 6 S.W.3d 102 (1999); *Malone v. Trans-States Lines, Inc.*, 325 Ark. 383, 926 S.W.2d 659 (1996); *Hollingsworth v. First Nat'l Bank & Trust Co.*, 311 Ark. 637, 846 S.W.2d 176 (1993); *Rabelais v. Bar-nett*, 284 Ark. 527, 683 S.W.2d 919 (1985). This court has specif-ically and deliberately rejected the theory of notice pleading. *See McKinney v. City of El Dorado*, 308 Ark. 284, 824 S.W.2d 826 (1992); *Treat v. Kreutzer*, 290 Ark. 532, 720 S.W.2d 716 (1986); *Harvey v. Eastman Kodak Co.*, 271 Ark. 783, 610 S.W.2d 582 (1981) (noting that the Arkansas Rules of Civil Procedure contain a "significant departure from the Federal Rules of Civil Proce-dure" in both Rule 8 and Rule 12; the federal rule speaks only in terms of a "claim," whereas the Arkansas rules specifically require a statement of "facts").

This court has frequently had the opportunity to consider what constitutes a statement of facts sufficient to survive a Rule 12(b)(6) motion to dismiss. In *Malone v. Trans-State Lines, supra,* appellant Malone filed a complaint alleging that his employer had discriminated against him in violation of the Arkansas Civil Rights Act. In his complaint, Malone averred that he "had a disability within the meaning of the Arkansas Civil Rights Act." Noting that "disability" was defined within the Act as a "physical or mental impairment that substantially limits a major life function," *see* Ark. Code Ann. § 16-123-2102(3), this court affirmed the trial court's dismissal of the complaint, holding that Malone's complaint contained no allegation of facts to support the conclusion that he met the definition of "disability." *Malone,* 325 Ark. at 386.

Similarly, in *Hollingsworth v. First Nat'l Bank & Trust Co., supra,* this court affirmed the dismissal of Hollingsworth's complaint. Hollingsworth filed a complaint alleging malicious prosecution and the tort of outrage against First National Bank. The bank had previously instituted a "RICO" action against her in federal court, where Hollingsworth prevailed. In her complaint, Hollingsworth set out the RICO allegations the bank leveled against her, stated that she had been absolved of those allegations, and further asserted that the bank had commenced the federal action maliciously and without probable cause. She also complained that the bank was liable for the tort of outrage because its actions were extreme and outrageous beyond the bounds of decency. The bank moved to dismiss under Rule 12(b)(6), and the trial court granted the motion. *Hollingsworth,* 311 Ark. at 639.

On appeal, this court affirmed, first setting out the elements of the torts that Hollingsworth alleged the bank had committed. The court then concluded that the complaint fell short of pleading a cause of action for malicious prosecution because it failed to plead sufficient facts to show either malice or lack of probable cause, writing as follows:

> In their complaint, [Hollingsworth] mention[s] no facts bearing on the background for [the bank] having filed the RICO action. [Hollingsworth] merely allege[s] [she] prevailed against [the bank's] allegations which is not the same as saying [the bank] had no probable cause to file the action in the first place. Concerning appellant Hollingsworth, the federal court obviously ruled sufficient evidence had been presented to send

her case to the jury. Such a ruling itself indicates probable cause accompanied the RICO action that the [bank] filed against her. Regardless, [Hollingsworth's] merely stating that the [bank's] actions were malicious is not sufficient to meet the pleading requirements under ARCP Rule 8(a)(1). The only facts . . . set out in the complaint were that Hollingsworth had been served while she was working at a school in front of some of her students and this manner of service was used to embarrass and humiliate her. Again, such an allegation has little to do with whether [the bank] had probable cause to bring the earlier RICO action against appellants. Likewise, [Hollingsworth] failed to plead any facts to support [her] cause of action for tort of outrage besides merely stating in summary fashion that the [bank's] actions were "extreme and outrageous beyond the bounds of decency." Accordingly, we uphold the trial court's decision to dismiss [the] complaint.

*Hollingsworth*, 311 Ark. at 640-41.

In *Brown v. Arkansas Department of Correction, supra*, this court again affirmed the trial court's granting of a motion to dismiss. There, Elizabeth Brown filed suit against the Department of Correction, alleging that the Department had violated her due-process rights in numerous ways. In affirming, this court noted that, although Brown's complaint was lengthy and referenced numerous statutory and constitutional provisions, it failed to set forth facts sufficient to state a claim. Specifically, the *Brown* court held that she had "merely claim[ed] in conclusory fashion that her due-process rights were violated, but she fail[ed] to set forth the facts necessary to support her claim." *Brown*, 339 Ark. at 461.

On the other hand, in *Rabalais v. Barnett, supra*, this court reversed the trial court's decision to grant a motion to dismiss with respect to one count in the complaint. The Rabalaises sued five members of the First United Methodist Church in Batesville for breach of contract and for the tort of outrage. This court agreed that the Rabalaises failed to state facts to support the outrage claim, where the complaint only asserted that the defendants "wilfully and wantonly breached the contract . . . to repair and rebuild the church organ causing the Rabalaises emotional distress." *Rabalais*, 284 Ark. at 528.

However, the court reversed the trial court's dismissal of the breach-of-contract claim. This court stated that, in order to state a cause of action for breach of contract, the complaint need only

assert the existence of a valid and enforceable contract between the plaintiff and defendant, the obligation of defendant thereunder, a violation by the defendant, and damages resulting to plaintiff from the breach. *Id.* at 528-29. In their complaint, the Rabalaises alleged that they entered into a contract with the defendants to rebuild the church organ, that the defendants discontinued their services prior to rebuilding the organ, and that the Rabalaises were entitled to damages. An amended complaint had attached to it a copy of the contract and the notice of termination. This court held that the complaint stated a cause of action for breach of contract: "The Rabalaises did not explain in detail all of the reasons for the disagreement, but that is not required. The [Rabalaises] should not be denied their right to the claim." *Id.* at 529.

In the present case, DEQ claims it did all that was required to state a cause of action under RATFA. Under RATFA, any one of four parties may be liable to the State for all costs of remedial actions under the Act: (1) the owner and operator of a facility; (2) any person who, at the time of disposal of any hazardous substance, owned or operated a hazardous substance site; (3) any generator of hazardous substances who, at the time of disposal, caused such substance to be disposed of at a hazardous substance site or who causes a release or threatened release of the hazardous substances; or (4) any transporter of hazardous substances who causes a release or threatened release of the hazardous substances or who, at the time of disposal, selected a hazardous-substance site for disposal of the hazardous substances. Ark. Code Ann. § 8-7-512(a) (Repl. 2000).

DEQ urges this court to conclude that DEQ stated sufficient facts in its complaint, setting forth the elements of a claim under RATFA, to establish a prima facie case that the defendants were liable under these statutes. Specifically, DEQ claims that it was required to allege only that a person generated or transported hazardous substances, caused disposal, or otherwise selected a hazardous substance site for disposal.

In its brief, DEQ asserts that it specifically alleged a number of facts, as follows: 1) the activities at the USI site began in or about 1975; 2) the activities continued until 1984 or 1985; 3) each of the defendants were USI customers who generated and/or transported hazardous substances and hazardous wastes to the site for disposal; 4) the activities that USI performed "on behalf of the defendants in this matter fit into distinct RATFA and AHWMA

liability categories"; 5) in conducting these activities "on behalf of the defendants," USI removed hazardous substances and hazardous wastes from defendants' oil; 6) these hazardous substances and hazardous wastes were then disposed of on the USI property; and 7) the USI property is contaminated with hazardous substances and hazardous wastes that threaten public health and the environment.

However, despite DEQ's contention that its complaint made reference to certain activities being conducted "on behalf of the defendants," a close reading of the complaint reveals that no such allegations were actually made, and the complaint's allegations almost exclusively refer to USI's activities and performance, and fails to describe the defendants' involvement. For example, paragraph 26 of the complaint states that, "[i]n conducting its business, USI provided some or all of the following services." That paragraph then goes on to list certain services USI performed, including, among other things, the following: treating and filtering spent PCB-containing oil from electrical equipment; testing PCB-containing transformer oil; buying or otherwise acquiring used PCB-containing oil from other facilities that wished to dispose of the oil and treating or filtering that oil; and salvaging and reclaiming component parts of used electrical equipment, including disposing of and reclaiming used PCB-containing oil from that equipment. The complaint then goes on to read that the treating, filtering and reclaiming process removed hazardous substances and hazardous wastes from the oil, and that these hazardous substances and wastes were then disposed of at the site.

Paragraph 31 of DEQ's complaint is the only averment that the defendants were "individual USI customers who generated and/or transported hazardous substances and hazardous wastes, including, but not limited to, PCB-containing oil, to the site for disposal." In paragraphs 33, 34, and 35 of the complaint, DEQ alleged that, "[o]n information and belief, USI used oil disposed of by [the] defendants at the site to conduct wood-treating operations. As a result of these processes, hazardous substances and hazardous wastes were spilled on the ground. As a result of this spillage, the surface and subsurface waters around the site were contaminated."

After describing the investigation undertaken by DEQ in the next several paragraphs, DEQ's complaint then contains paragraphs 46 through 67, setting out statutory provisions from RATFA and AHWMA, captioned "Violations of Law." This

portion of the complaint includes two paragraphs that purport to state DEQ's legal claim against the defendants. The RATFA claim, found in paragraph 57, reads as follows:

> The Defendants are "persons" that generated or transported "hazardous substances," and who disposed of such substances at a "hazardous substance site," or otherwise selected a "hazardous substance site" for disposal, where a "release of hazardous substances" or a "threatened release" occurred, and are therefore liable to the State for all costs of "remedial action."

Additionally, paragraph 67, concerning the AHWMA claims, states the following:

> The Defendants are "persons" who have "transported" and/or "disposed" of "hazardous wastes" contrary to the rules, regulations, permits, or orders issued under the HWMA or in such a manner or place as to create or as is likely to be created a public nuisance or a public health hazard or to cause or is likely to cause water or air pollution within the meaning of the Arkansas Water and Air Pollution Control Act, and are therefore liable for all costs, expenses, and damages to DEQ and any other agency or subdivision of the State in enforcing or effectuating the provisions of this law, including, but not limited to, natural resource damages.

In granting the motion to dismiss, the trial court focused on these foregoing paragraphs captioned "Violations of Law," and concluded that, "at the most, [DEQ's] complaint . . . [consists of] nothing more than generalities and conclusions of law with no specifics alleged as to the individual defendants. [DEQ] has done nothing more than set out in great detail the provisions of RATFA [and AHWMA] and, in effect, alleged that defendants have violated th[ese] statute[s]." We agree with the trial court on this issue.

As we pointed out above, the only paragraph directly linking the defendants to USI is paragraph 31, and clearly, that paragraph states only that the defendants were customers who brought their waste oil to USI for disposal. It contains no factual allegations specifying which, if any, of the defendants contributed any PCB-containing oil to the site, how much or when any given defendant may have contributed used oil, or the purposes for which the defendants conducted business with USI. The mere recitation that the defendants were "generators" or "transporters" who brought hazardous substances or hazardous waste to the USI site "for disposal," without any further facts to support a conclusion that the

defendants came within the meanings of these terms, simply fails to comport with our fact–pleading requirements. *See Malone, supra.*

The question of whether the defendants brought their oil to USI "for disposal" brings us to DEQ's second point, wherein DEQ argues that the defendants "caused" a "disposal." As noted above, in order to be subject to liability under RATFA, one must have been a generator of hazardous substances who, "*at the time of disposal,* caused such substance to be disposed of at a hazardous substance site or who causes a release or threatened release of the hazardous substance." § 8–7–512(a)(3) (emphasis added). Alternatively, one may be liable as a "transporter of hazardous substances who causes a release or threatened release of the hazardous substances or who, *at the time of disposal,* selected a hazardous substance site for disposal of the hazardous substances." § 8–7–512(a)(4) (emphasis added).

The word "disposal" has a specific meaning within the context of RATFA. Although the word itself is not defined in RATFA, that Act provides that the word "shall have the meaning provided in § 3 of the Arkansas Hazardous Waste Management Act." The AHWMA, in turn, defines disposal as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water in whatever manner so that such hazardous waste or any constituent thereof might or might not enter the environment or be emitted into the air or discharged into any waters including groundwaters." Ark. Code Ann. § 8–7–203(4) (Repl. 2000).

In considering the meaning of a statute, our first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Raley v. Wagner,* 346 Ark. 234, 57 S.W.3d 683 (2001); *Dunklin v. Ramsay,* 328 Ark. 263, 944 S.W.2d 76 (1997). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Stephens v. Arkansas Sch. for the Blind,* 341 Ark. 939, 20 S.W.3d 397 (2000); *Burcham v. City of Van Buren,* 330 Ark. 451, 954 S.W.2d 266 (1997). Where the meaning is not clear, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. *Stephens, supra* (citing *State v. McLeod,* 318 Ark. 781, 888 S.W.2d 639 (1994)). Finally, the ulti-

mate rule of statutory construction is to give effect to the intent of the General Assembly. *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999); *Kildow v. Baldwin Piano & Organ*, 333 Ark. 335, 969 S.W.2d 190 (1998).

Here, we are called upon to determine what is meant by the word "disposal." The defendants urge an interpretation that requires some temporal link between the causation and the disposal. The defendants focus on the phrase "at the time of disposal," contained in subsections (a)(3) and (4) of § 8-7-512. This language, they contend, requires direct, active involvement, and further requires that the actions of the generator or transporter of the 'hazardous substances in "causing" the substance to be disposed of must take place at the same time the disposal actually occurs. Because DEQ failed to allege facts that the defendants were present at the time USI actually disposed of the hazardous substances, the defendants urge that they did not "cause" the disposal of any such substances.

 DEQ, on the other hand, argues in its brief that there should be no temporal limitations on activity, and maintains that, as a result, it should not be required to aver facts of actual disposal. Further, at oral argument, DEQ contended that the "at the time of disposal" language is merely surplus verbiage that means nothing. However, we cannot so lightly dispose of language that the General Assembly must have inserted to serve some purpose. In construing a statute, it is our duty to construe it just as it reads, giving the words their plain and ordinary meanings. *See ERC Contractor Yard & Sales v. Robertson*, 335 Ark. 63, 977 S.W.2d 212 (1998); *Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 974 S.W.2d 464 (1998). To simply ignore this clause would be to disregard our rules of construction.

 We conclude that the phrase "at the time of disposal," taken in conjunction with the definition of "disposal" found in the AHWMA, should be construed to mean, "at the time the hazardous substances were discharged, deposited, injected, dumped, spilled, leaked, or placed any hazardous substances into or on any land or water." Given this interpretation, it is glaringly apparent that DEQ's complaint is bereft of any factual allegations that, *at the time of disposal*, any of the defendants caused hazardous substances to be disposed of at a hazardous-substance site, or selected a hazardous substance site for disposal of the hazardous substances. Consistent

with this view, we point out that the General Assembly, in enacting RATFA, provided that "[n]o person, including the state, may recover under the authority of this section for any remedial action costs or damages resulting solely from an act or omission of a third party[.]" Ark. Code Ann. § 8-7-515(b) (Repl. 2000). Here, that third party was USI. In sum, the General Assembly never intended an innocent customer to be found liable resulting from unlawful conduct by an owner/operator like USI.[2] Therefore, we affirm the trial court's dismissal of DEQ's complaint.[3]

 Before turning to the defendants' cross-appeal, we must address what is to befall DEQ's complaint. When a complaint is dismissed under Rule 12(b)(6) for failure to state facts upon which relief can be granted, the dismissal should be — and here was — without prejudice. See *Ratliff v. Moss*, 284 Ark. 16, 678 S.W.2d 369 (1984). The plaintiff then has the election to either plead further or appeal. *Id.* When the plaintiff chooses to appeal, he or she waives the right to plead further, and the complaint will be dismissed with prejudice. See *Arkhola Sand & Gravel Co. v. Hutchinson*, 291 Ark. 570, 726 S.W.2d 674 (1987). Therefore, the dismissal of DEQ's complaint is modified to be with prejudice.

On cross-appeal, the defendants argue that the trial court erred in finding that DEQ's RATFA and AHWMA claims were not barred by the three-year statute of limitations. The defendants urge that the general three-year statute of limitations, found in Ark. Code Ann. § 16-56-105(3) (1997) (governing "all actions founded on any contract or liability, expressed or implied"), should apply to the State, as well as to any private parties that might bring an action under RATFA. In particular, the defendants point to Ark. Code Ann. § 8-7-507 (Repl. 2000), which provides as follows:

---

[2] On this point, we note that the defendants offered an apt analogy: if one took one's car to a garage for a tune-up, and the mechanic dumped the used oil on the ground behind the garage instead of disposing it properly, it could not fairly be said that the car owner "caused" an improper disposal.

[3] DEQ raised two other issues on appeal, challenging the trial court's conclusions that RATFA could not be applied retroactively to cover events that occurred before that Act's passage, and that used oil intended for recycling cannot be considered a "hazardous substance" within the meaning of RATFA. However, because we agree that the complaint was factually insufficient, we do not reach or address these last two issues.

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the federal government and *the state government shall be subject to, and comply with, this part in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under this section.*

(Emphasis added.) This, according to the defendants, means that the General Assembly has subjected the State, including DEQ, to all provisions of the statute, including liability, in the same manner as any private entity; to argue that this does not include the statute of limitations would require the court to "ignore the clear and simple words of the state." The defendants argue that, because every alleged illegal activity took place before 1984 or 1985, the statute should have run over a decade ago.

In response, DEQ points out that, ordinarily, the statute of limitations does not run against the State. *See Ark. State Hosp. v. Cleburne County*, 271 Ark. 94, 607 S.W.2d 61 (1980); *Alcorn v. Arkansas State Hosp.*, 236 Ark. 665, 367 S.W.2d 737 (1963); *Jensen v. Fordyce Bath House*, 209 Ark. 478, 190 S.W.2d 977 (1945). In *Jensen*, this court held that it was "well-established that statutes of limitation do not run against sovereign states unless by the terms of the limitation statute it is made applicable to the state[.]" This principle was further explained in *Alcorn, supra,* as follows:

> In a discussion of the question in 34 Am. Jur. p. 309, it is said: "It has been said that the maxim *"nullum tempus occurrit regi"*[4] is an attribute of sovereignty only, and cannot be invoked by counties or other subdivisions of the state. In many cases, probably a majority, a distinction is drawn between cases where a subordinate political subdivision or agency is seeking to enforce a right in which the public in general has an interest and those where the public has no such interest, and it is held that the statute of limitations, while applicable to the latter character of actions, cannot be interposed as a bar where the municipality is seeking to enforce the former type of action. In these decisions, the view is taken that the plaintiff, in seeking to enforce a contract right, or some right belonging to it in a proprietary sense, may be defeated by the statute of limitations; *but as to rights belonging to the public and pertaining purely to governmental affairs, and in respect to which the political subdivision represents the public at large or*

---

[4] "Time does not run against the king." *Black's Law Dictionary* 1068 (6th ed. 1990).

*the state, the exemption in favor of the sovereignty applies, and the statute of limitations does not operate as a bar.*

*Alcorn*, 236 Ark. at 670-71 (quoting *Jensen, supra*) (emphasis provided in original).

■ In the present case, the "rights" at issue belong to the public — i.e., the enforcement of environmental regulations intended to improve the environment for the benefit of the public — and the state agency represents the public at large; therefore, the exemption applies, and the statute of limitations does not bar the action. The trial court did not err in reaching this conclusion, and we therefore affirm on cross-appeal.

BROWN, IMBER, and HANNAH, JJ., dissent.

R OBERT L. BROWN, Justice, dissenting. The majority opinion affirms the dismissal of the Arkansas Department of Environmental Quality's complaint brought against twelve Arkansas corporations. The Department's complaint sought to declare those corporations in violation of the Arkansas Remedial Action Trust Fund Act for disposing of hazardous substances, specifically polychlorinatedbiphenyls (PCBs), in violation of the Act. The majority goes farther and dismisses the Environmental Quality Department's complaint "with prejudice," thus foreclosing it from bringing the same complaint against these business corporations in an amended form. I disagree that the Department failed to allege facts sufficient to state a cause of action under the Act. I further am convinced that the limited interpretation placed on the Act by the majority, requiring the defendant corporations to actively participate in the dumping of hazardous substances, eviscerates much of what the Act was intended to correct.

## I. Facts Alleged

To decide whether the Department has pled a cause of action, we must turn to the complaint itself. What follows are the factual allegations set out in the complaint, and the alleged violations of the Remedial Action Trust Fund Act:

### IV. Factual Allegations

22. Beginning in or about 1975, Utility Services, Inc. ("USI") operated a business on a site of approximately thirty (30) acres in Jefferson County, Arkansas ("the site" or "the USI property").

23. USI continued its business operations until 1984 or 1985.

24. USI is no longer in operation and has no assets.

25. During the time it was in business, USI engaged in the repair and maintenance of various electrical equipment and components.

26. In conducting its business, USI provided some or all of the following services:

(a) treating and filtering spent oil containing polychlorinatedbiphenyls ("PCB-containing oil") from electrical transformers and other electrical equipment at the site for the purpose of reclaiming the oil or restoring it to or near its original properties;

(b) testing PCB-containing transformer oil, which included the disposal of the oil after sampling;

(c) re-gasketing and repairing transformer bushings, which includes draining and disposing of the old PCB-containing oil from the bushing and refilling it with new oil;

(d) buying or otherwise acquiring used PCB-containing oil from other facilities that wished to dispose of the oil and treating or filtering it as described in (a) above to use in its operations or to sell to other facilities; and

(e) salvaging and reclaiming component parts of used electrical equipment, including disposing of and reclaiming used PCB-containing oil from that equipment.

27. The treating, filtering and reclaiming process, as described in paragraph 26, removed hazardous substances and hazardous wastes from the oil.

28. These hazardous substances and hazardous wastes were then disposed of at the site.

29. In addition to those business operations described in paragraph 26, USI conducted a wood treating operation at the site.

30. In this process, the PCB-containing oil and pentachlorophenol were used to preserve wood products.

31. The Defendants were individual USI customers who generated and/or transported hazardous substances and hazardous wastes, including, but not limited to, PCB-containing oil, to the site for disposal.

32. The disposal of these hazardous substances and hazardous wastes was conducted in such a manner as to constitute unsound disposal and management practices.

33. On information and belief, USI used oil disposed of by Defendants at the site to conduct wood treating operations.

34. As a result of these processes, hazardous substances and hazardous wastes were spilled on the ground.

35. As a result of this spillage, the surface and subsurface waters around the site were contaminated.

36. On or about November 2, 1990, ADEQ personnel conducted an investigation on the USI property.

37. This investigation revealed a number of drums and tanks, some of which were deteriorating, that contained high levels of PCB-containing oils, trichloroethene, and tetrachloroethene.

38. In addition, the investigation revealed that the soil in and around the site was contaminated with oil, polychlorinatedbiphenyls ("PCBs"), and pentachlorophenol.

39. ADEQ's investigation was limited, and other hazardous substances and hazardous wastes, including, but not limited to, trichloroethene, and tetrachloroethene, are also likely to be present at the site.

40. On February 21, 1991, ADEQ entered into a Consent Administrative Order ("CAO") with EAI to perform certain preliminary actions to stabilize and secure the site and reduce the potential for further release of hazardous substances and hazardous wastes. (This CAO is attached hereto as "Exhibit A".)

41. The CAO referenced in paragraph 40 further provided that the stabilization actions undertaken by EAI would not constitute final action at the site and that a final remedial action would be negotiated.

42. ON May 12, 1993, ADEQ entered a second CAO with the "Utility Services PRP Committee," primarily for the purpose of removing drums of hazardous substances and hazardous materials from the site. (This CAO is attached hereto as "Exhibit B".)

43. On May 12, 1993, in accordance with ARK. CODE ANN. § 8-7-508(a)(1) and ARK. CODE ANN. § 8-7-511, an Administrative Notice of Liability and Request for Information was issued to a number of entities, including the Defendants, and an opportunity for a hearing was provided. (A sample Administrative Notice of Liability and Request for Information is attached hereto as "Exhibit C".)

44. None of the parties notified of responsibility accepted responsibility for final remediation of the site.

45. Although remedial actions to date have resulted in the removal of all of the drums and tanks from the site, the soil and groundwater of the site remain contaminated with hazardous substances and hazardous wastes that continue to threaten public health and the environment.

## V. *Violations of Law*

### A. *Violations of the Remedial Action Trust Fund Act*

46. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 45 above.

47. ARK. CODE ANN. §§ 8-7-501, *et seq.*, otherwise known as the Remedial Action Trust Fund Act, sets forth the State regulatory program governing the liability for and the remediation of hazardous substance sites.

48. Under ARK. CODE ANN. § 8-7-512(a)(3), any generator of hazardous substances who, at the time of disposal, caused such substance to be disposed of at a hazardous substance site or who causes a release or threatened release or [sic] the hazardous substances, shall be liable to the State for all costs of remedial actions.

49. Likewise, under ARK. CODE ANN. § 8-7-512(a)(4), any transporter of hazardous substances who causes a release or threatened release of hazardous substances or who, at the time of disposal, selected a hazardous substance site for disposal of the hazardous substances, shall be liable to the State for all costs of remedial actions.

50. A "person" is defined as any individual, corporation, company, firm, partnership, association, trust, joint-stock company or trust, venture, state or federal government agency, or any other legal entity, however organized. ARK. CODE ANN. § 8-7-503(8).

51. The term "hazardous substance" includes a variety of substances, elements, compounds, mixtures, solutions, and pollutants as designated pursuant to any of the following laws: (1) the Federal Water Pollution Control Act, (2) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, (3) the Arkansas Hazardous Waste Management Act of 1979, (4) the federal Clean Air Act, or (5) the federal Toxic Substances Control Act. ARK. CODE ANN. § 8-7-503(6).

52. As defined in paragraph 51, the term hazardous substance includes PCBs, pentachlorophenol, trichloroethene, tetrachloroethene, and petroleum based products.

53. As used in RATFA, "hazardous substance sites" are any sites or facilities where hazardous substances have been disposed of or from which there is a release or threatened release of hazardous substances. ARK. CODE ANN. § 8-7-503(7).

54. The term "releases of hazardous substances" means any spilling, leaking, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of hazardous substances into the environment. ARK. CODE ANN. § 8-7-503(9).

55. A "threatened release" is any situation where a nonsudden release of hazardous substances can be reasonably expected, unless prevented by change of operation or installation or construction or [sic] containment or treatment devices or by removal or other remedial action. ARK. CODE ANN. § 8-7-503(11).

56. As defined by RATFA, the term "remedial action" means action necessary to effect permanent control, abatement, prevention, treatment, or containment of releases and threatened releases, including the removal of hazardous substances from the environment where removal is necessary to protect public health and the environment. ARK. CODE ANN. § 8-7-503(10).

57. The Defendants are "persons" that generated or transported "hazardous substances," and who disposed of such substances at a "hazardous substance site," or otherwise selected a "hazardous substance site" for disposal, where a "release of hazardous substances" or a "threatened release" occurred, and are therefore liable to the State for all costs of "remedial action."

Without question, the complaint alleges that :

- USI operated a site for disposal of hazardous substances from 1975 to 1984 or 1985;

- During this time frame the defendant corporations were generators and transporters of hazardous substances to the site;

- The defendant corporations, at the time of disposal (1) caused disposal of hazardous substances at the site, or (2) caused a release of hazardous substances, or (3) selected a hazardous substance site for disposal of the substances.

These allegations track the liability provisions of the Remedial Action Trust Fund Act, which reads:

(a) Any of the following shall be liable to the state for all costs of remedial actions under this subchapter:

(1) The owner and operator of a facility;

(2) Any person who, at the time of disposal of any hazardous substance, owned or operated a hazardous substance site;

(3) Any generator of hazardous substances who, at the time of disposal, caused such substance to be disposed of at a hazardous substance site or who causes a release or threatened release of the hazardous substances; or

(4) Any transporter of hazardous substances who causes a release or threatened release of the hazardous substances or who, at the time of disposal, selected a hazardous substance site for disposal of the hazardous substances.

Ark. Code Ann. § 8-7-512(a) (Repl. 2000).

And what constitutes "disposal"? According to the Hazardous Substances subchapter of the Environmental Law Code, "disposal" means: "the discharge, deposit, injection, dumping, spilling, leaking, or *placing* of any hazardous waste into or on any land or water *in whatever manner* so that such hazardous waste or any constituent thereof *might or might not enter the environment* or be emitted into the air or discharged into any waters including groundwaters; . . ." Ark. Code Ann. § 8-7-203 (Repl. 2000).[1] The definition of "disposal" could not be broader. Without question, the defendant corporations caused hazardous substances to be placed at the USI site which constitutes a disposal under § 8-7-203(4).

I frankly do not know what additional allegations needed to have been made by the Department of Environmental Quality to state a viable cause of action. The Department specified the time frame for the alleged violation: 1975 to 1984-1985. It specified where the hazardous substances were disposed of — the USI treatment facility. It specified what hazardous substances were involved — PCBs.

We are indeed a fact-pleading state, but filing a complaint is the first step in litigation. Discovery will ensue, and additional facts will be developed. What the majority has required in the way of fact-pleading is simply too restrictive and severely hampers the ability of the Department to enforce the Act.

---

[1] The definition of "disposal" is contained within the Hazardous Waste Management Act, but is the definition to be used for the entire Hazardous Substances subchapter. *See* 8-7-203 (Repl. 2000).

The allegations are clear. The defendant corporations are alleged to have disposed of PCB-contaminated oil by generating it, transporting, and placing it with USI for elimination. Accordingly, they are liable under the Act, according to the Department, for any resulting damage to the environment.

## II. Limited Liability

The majority also severely limits corporate liability by interpreting "at the time of disposal" in the Act to mean that generators and transporters of hazardous substances must actively participate in the specific disposal of hazardous substances, such as, the dumping or spillage, which results in damage to the environment. This reading is completely at odds with the broad "disposal" definition in § 8-7-203, which speaks of placing such substances on land *in whatever manner* so that the waste *might or might not enter the environment*. Any placement violates the Act, if damage to the environment occurs. The majority fails to confront this broad definition of disposal in its opinion.

Again the two relevant subsections are these:

(a) Any of the following shall be liable to the state for all costs of remedial actions under this subchapter: .

. . . .

(3) Any generator of hazardous substances who, at the time of disposal, caused such substance to be disposed of at a hazardous substance site or who causes a release or threatened release of the hazardous substances; or

(4) Any transporter of hazardous substances who causes a release or threatened release of the hazardous substances or who, at the time of disposal, selected a hazardous substance site for disposal of the hazardous substances.

Ark. Code Ann. § 8-7-512(a) (Repl. 2000).

The majority reads "at the time of disposal" to mean disposal by the generator or transporter corporation. The Department reads the phrase to refer to disposal by USI. The Department is correct; otherwise, subsections (3) and (4) would make no sense. Generators and transporters are liable if they cause hazardous substances to be placed at a hazardous-substance site, which substances are then improperly treated by the operator of the site, in

this case USI. Placement at the site by generators or transporters like the appellant corporations and improper treatment by USI are two separate acts that occur in different time frames, not simultaneously. The majority's limiting interpretation undercuts much of what the Act was intended to rectify.

The majority also wanders far afield when it suggests that the instant case compares to one where a person having a tuneup for his car could be in violation of the Act, if the service station improperly dumps the used oil. That analogy is far from apt. Individual persons do not take their used oil laced with PCBs to service stations for disposal. The Department has alleged that the defendant corporations in the case before us did exactly that. The allegation is that they took their PCB-contaminated oil to USI for elimination.

According to the Department, the onus was on those businesses to assure that proper treatment and elimination of those hazardous substances later transpired, or else they would be liable under the Act. The Department alleges that pollution did occur. That is sufficient, in my judgment, to mount a complaint under the Act. I respectfully dissent.

IMBER and HANNAH, JJ., join.

JIM HANNAH, Justice, dissenting. I respectfully dissent. I believe that DEQ's complaint was legally sufficient. "A pleading which sets forth a claim for relief. . . shall contain . . . a statement in ordinary and concise language of facts showing that the court has jurisdiction of the claim and is the proper venue and that the pleader is entitled to relief." Ark. R. Civ. P. 8(a) (2002). Rule 12(b)(6) provides for dismissal of a complaint for "failure to state facts upon which relief can be granted." Ark. R. Civ. P. 12(b)(6) (2002). We have stated that the two rules must be read together in testing the sufficiency of a complaint; *facts*, not mere conclusions must be alleged. *Malone v. Trans-States, Lines, Inc.*, 325 Ark. 383, 926 S.W.2d 659 (1996); *Hollingsworth v. First Nat'l Bank & Trust Co.*, 311 Ark. 637, 846 S.W.2d 176 (1993).

The court recently outlined its standard of review of motions to dismiss under Ark. R. Civ. P. 12(b)(6) in *Clayborn v. Bankers Standard Insurance Co.*, 348 Ark. 557, 75 S.W.3d 174 (2002). The court wrote:

> In reviewing the trial court's decision on a motion to dismiss under Ark. R. Civ. P. 12(b)(6), we treat the facts alleged in the complaint as true and view them in the light most favorable to the party who filed the complaint. In testing the sufficiency of the complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. We look to the underlying facts supporting an alleged cause of action to determine whether the matter has been sufficiently pled.

*Clayborn*, 348 Ark. at 561-62 (citations omitted).

The appellees argue that DEQ's complaint contains only one factual allegation, which is contained in Paragraph 31, related to the conduct of the appellees. Paragraph 31 states:

> The Defendants were individual USI customers who generated and/ or transported hazardous substances and hazardous wastes, including, but not limited to, PCB-containing oil, to the site for disposal.

In *Rabalaias v. Barnett*, 284 Ark. 527, 683 S.W.2d 919 (1985), the court reversed the lower court's finding that the appellants had failed to state a claim upon which relief could be granted. In *Rabalaias*, the appellants sued church members for breach of contract and for the tort of outrage. This court held that the allegations regarding the tort of outrage were meritless; however, the court held that the appellants had stated sufficient facts in the complaint for the breach-of-contract claim. The court held that

> the trial court was treating the motion to dismiss like a motion to make more definite and certain rather than testing the sufficiency of the complaint as required by our rules. In this case the complaint stated a cause of action for breach of contract. The Rabalaises did not explain in detail all of the reasons for the disagreement, but that is not required. The appellants should not be denied their right to the claim.

*Rabalaias*, 284 Ark. at 529. In addition, the court stated that "[p]leadings . . . are sufficient if they advise a defendant of his obligations and allege a breach of them." *Id.* at 528 (citing *Allied Chem. Corp. v. Van Buren Sch. Dist.*, 264 Ark. 810, 575 S.W.2d 445 (1979)).

In the present case, DEQ's complaint advised the appellees that transporters and generators of hazardous substances are responsible for remedial clean-up of hazardous sites. The complaint also alleged that the appellees, as customers of USI, were either transporters or generators from which the State could seek funds for clean-up purposes.

I disagree with the majority's statement that "the General Assembly never intended an innocent customer to be found liable resulting from unlawful conduct by an owner/operator like USI." We must look no further than Ark. Code Ann. § 8-7-502 (Repl. 2000) to determine the legislative intent of RATFA. Ark. Code Ann. § 8-7-502 provides, in part:

> (a) It is the intent of the General Assembly to provide the state with the necessary authority and funds to investigate, control, prevent, abate, treat, or contain releases of hazardous substances necessary to protect the public health and the environment, including funds required to assure payment of the state's participation in response actions pursuant to the federal Comprehensive Environment Response, Compensation and Liability Act of 1980, and to encourage the reduction of hazardous waste generation.

> (b) The purpose of this subchapter is to encourage privately funded remedial action and to clarify that persons who have undertaken remedial action at a hazardous substance site in response to an action initiated by the Arkansas Department of Environmental Quality pursuant to § 8-7-508 may obtain contribution from any other person who is liable for remediation of the hazardous substance site.

> (c) A further purpose of this subchapter is to clarify the General Assembly's intent to provide the department with the necessary funds for remedial action at a hazardous substance site, recognizing that both public and private funds must be expended to implement remedial action at the hazardous substance sites which exist in this state. . . . .

The General Assembly has determined that it is the policy of this State that the hazardous-waste sites shall be cleaned up. RATFA was promulgated, in part, to fund response actions pursuant to Comprehensive Environment Response, Compensation and Liability Act of 1980 ("CERCLA"). This court has stated that the federal courts' construction of federal statutes upon which

state statutes have been patterned should be accorded "great weight" in our own construction of those state statutes. *Gurley v. Mathis*, 313 Ark. 412, 856 S.W.2d 616 (1993); *Dicken v. Missouri Pac. R.R. Co.*, 188 Ark. 1035, 69 S.W.2d 277 (1934). CERCLA, also known as "Superfund," was enacted by Congress in 1980 "to ensure prompt and efficient cleanup of hazardous waste cites and to place the costs of those cleanups on the [responsible parties]." *United States v. Azko Coatings of America, Inc.*, 949 F.2d 1409, 1416-17 (6th Cir. 1991). The provisions of RATFA provide that generators and transporters of hazardous substances who cause disposal of those substances are liable for clean-up costs.

### Liability to Generators and Transporters Who Cause Disposal

DEQ argues that its complaint should be deemed legally sufficient and that it should not be required to aver facts of actual disposal. The appellees argue that they did not cause a disposal and that DEQ failed to allege facts supporting any such claim. DEQ contends that the trial court "incorrectly believed that in order for liability to attach under RATFA, DEQ would have to present evidence that the Appellees actively participated in hazardous substance disposal at the USI site." DEQ argues that active participation in hazardous substance disposal at a hazardous-substance disposal site is not a prerequisite to liability. The appellees argue that direct involvement is required for liability.

Arkansas Code Annotated § 8-7-512 (Repl. 2000) provides, in part:

(a) Any of the following shall be liable to the state for all costs of remedial actions under this subchapter:

(1) The owner and operator of a facility;

(2) Any person who, at the time of disposal of any hazardous substance, owned or operated a hazardous substance site;

(3) Any generator of hazardous substances who, at the time of disposal, caused such substance to be disposed of at a hazardous substance site or who causes a release or threatened release of the hazardous substances; or

(4) Any transporter of hazardous substances who causes a release or threatened release of the hazardous substances or who, at the time of disposal, selected a hazardous substance site for disposal of the hazardous substances.

> " 'Releases of hazardous substances' means . . . any spilling, leaking, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of hazardous substances into the environment.

Ark. Code Ann. § 8-7-503(9) (Repl. 2000).

> " 'Threatened release' means . . . any situation where a nonsudden release of hazardous substances can be reasonably expected, unless prevented by change of operation or installation or construction of containment or treatment devices or by removal or other remedial action."

Ark. Code Ann. § 8-7-503(11) (Repl. 2000).

> "Disposal" is defined as:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water in whatever manner so that such hazardous waste or any constituent thereof might or might not enter the environment or be emitted into the air or discharged into any waters including groundwaters.

Ark. Code Ann. § 8-7-203(4) (Repl. 2000).

The issue is whether the appellees *caused* disposal of hazardous wastes and hazardous substances. The appellees argue that all of the factual allegations in the complaint that could be construed as "causing" a disposal apply only to USI. In addition, the appellees argue that there is a "temporal requirement" for liability under RATFA because a party's actions that cause "disposal" must take place at the same time the disposal occurs. The appellees state that "[t]o prevail, DEQ must allege and prove that Defendants *at the time of disposal, caused the disposal,* or *at the time of disposal, selected the hazardous substance site for disposal.*" DEQ argues that the appellees can be liable if DEQ shows that the appellees " 'caused' disposal or otherwise 'selected a hazardous substance site for disposal' by sending waste oil to the USI site."

The problem with the "temporal requirement" argument is that it ignores the fact that the statute imposes liability for generators or transporters that *cause* the disposal or select the site for disposal. The statute does not require that generators or transporters be the *proximate cause* of disposal. "Cause" is defined as "[s]omething that produces an effect or result," whereas "proximate cause" is defined as "[a] cause that directly produces an

event and without which event would not have occurred." *Black's Law Dictionary* 212-13 (7th ed. 1999).

The appellees state that they "have no quarrel with DEQ's apparent position that USI, and the individuals operating USI, might have handled materials in a manner violative of these statutes." However, the appellees contend that the statutes upon which DEQ relies specifically prohibit imputation of liability to a third party. RATFA contains a provision which provides:

> No person, including the state, may recover under the authority of this section for any remedial action costs or damages resulting *solely* from an act or omission of a third party or from an act of God or an act of war.

Ark. Code Ann. § 8-7-515(b) (Repl. 2000) (emphasis added). Similarly, AHWMA contains a provision which provides:

> No person, including the state, may recover under the authority of this section for any response costs or damages resulting *solely* from an act or omission of a third party or from an act of God or an act of war.

Ark. Code Ann. § 8-7-416(b) (Repl. 2000) (emphasis added). The appellees argue that these provisions clearly express the General Assembly's intent to exclude liability for the acts of third parties under both RATFA and AHWMA, and that the General Assembly never intended an "innocent customer" to be saddled with liabilities resulting from conduct resulting from an owner or operator like USI. These statutes do not automatically exclude customers from liability; rather, customers will not be liable for costs or damages resulting *solely* from an act or omission of a third party. The alleged disposal of hazardous substances did not result *solely* from an act or omission of USI. Before USI could dispose of a hazardous substance, it had to be in possession of a hazardous substance. The complaint alleges that USI acquired hazardous substances from the appellees — the alleged generators and transporters.

In the present case, the issue of whether Ark. Code Ann. § 8-2-416(b) bars the appellees' liability is a question that should be developed by discovery or proof at trial. The appellees generated hazardous wastes or hazardous substances or transported hazardous substances or hazardous wastes. While USI *actually disposed* of the used oil, but for the delivery of the used oil to USI from the

appellees, there would be no disposal. Surely the General Assembly did not intend for customers of hazardous waste sites, upon delivering used oil to the hazardous waste sites, to be able to wash their hands of responsibility for the used oil.

The majority focuses on the statutory language which provides that in order to be subject to liability under RATFA, a generator or transporter must cause disposal "at the time of disposal." The majority states that "we cannot so lightly dispose of language that the General Assembly must have inserted to serve some purpose." While it is true that we must construe a statute just as it reads, we do not engage in interpretations that defy common sense and produce absurd results. *See Green v. Mills*, 339 Ark. 200, 205, 4 S.W.3d 493 (1999). Moreover, in construing statutes, we look to the language under discussion in the context of the statute as a whole. *Id.*

The majority's interpretation of the statute would create an absurd result and frustrate the intent of the General Assembly. Under the majority's interpretation, customers of hazardous waste sites would bear no responsibility in cleaning up the hazardous substances that they helped create. According to the majority, a customer may wash its hands of any responsibility for clean-up the moment it delivers the hazardous substance to the owner or operator of a hazardous waste site unless there is specific proof that the customer knew how the hazardous substance was to be disposed of or was present and participated in the disposal of the hazardous substance. Again, the purpose of the statute is "to protect the public health and the environment. . . ." Ark. Code Ann. § 8-7-502.

Hazardous-waste sites become hazardous-waste sites after the disposal of hazardous substances. DEQ's complaint is legally sufficient to withstand a Rule 12(b)(6) challenge. Whether the appellees should be responsible as generators or transporters of hazardous substances to a hazardous-waste site is a question of fact that should be developed by discovery or proof at trial.

For the above reasons, I respectfully dissent.

BROWN and IMBER, JJ., join this dissent.